IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

BRANDON SCOTT BLACKMON,

      Petitioner,

v.                          Case No. 2:09-cv-00789

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.


## PROPOSED FINDINGS AND RECOMMENDATION

On July 8, 2009, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (docket sheet document # 2). This matter is assigned to the Honorable John T. Copenhaver, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

On November 4, 2009, pursuant to the undersigned's Order, and following several extensions of time, Respondent filed a Response to the Petition (# 17), a Motion for Summary Judgment, with accompanying exhibits (# 18), and a Memorandum in Support (# 19). On November 4, 2009, in accordance with the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the undersigned entered an Order advising Petitioner of his right to file a response to Respondent's Motion for Summary Judgment, and setting deadlines for

a response and reply.  (# 20).

On February 8, 2010, Petitioner filed a Response to the Respondent's Motion for Summary Judgment. (# 23). Respondent did not file a reply. This matter is ripe for determination.

### STATE COURT PROCEEDINGS

On May 16, 2001, Petitioner was indicted by a Logan County grand jury on one count of murder (Count One) and one count of conspiracy to commit murder (Count Two) (State v. Blackmon, Case No. 01-F-96-P) (# 18, Ex. 1).  Following a jury trial conducted between October 8 and October 15, 2002, Petitioner was convicted of one count of murder, without a recommendation of mercy. (Id., Ex. 2).  By Order entered November 12, 2002, Petitioner was sentenced to life in the state penitentiary without the possibility of parole. (Id.)

On September 15, 2003, Petitioner, by counsel, filed a Petition for Appeal of his conviction and sentence to the Supreme Court of Appeals of West Virginia (the "SCAWV"). (Id., Ex. 3). The Petition for Appeal was refused by the SCAWV on January 27, 2004. (Id.)

On March 9, 2004, Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Logan County. (Id., Ex. 4). Sometime thereafter, Petitioner, by counsel, filed an Amended Petition for a Writ of Habeas Corpus Ad Subjiciendum in the Circuit Court of Logan County. (# 2-2 at 58-78, Appx. D).  On April 30,

2008, the Circuit Court entered an Order addressing the merits of the claims in the petition and denying Petitioner habeas corpus relief. (Id., Ex. 5).

Petitioner filed a Petition for Appeal from the denial of the Circuit Court habeas corpus petition in the SCAWV on December 10, 2008. (Id., Ex. 6). The Petition for Appeal was refused on February 25, 2009. (Id.) Petitioner then filed the instant section 2254 petition on July 8, 2009.

Petitioner raises 11 grounds for relief in his section 2254 petition. Those grounds are as follows:

1. The trial court erred when it denied Petitioner's motions for a new trial and judgment of acquittal.

2. Petitioner's right to a fair and impartial jury and due process of law was violated as a result of racial discrimination and bias of jury members which was denied during pre-trial voir dire.

3. The court erred by granting the State's motion to introduce unrelated bad acts of Petitioner to suggest that he behaved in a consistent manner the night of the crime.

4. Prior inconsistent statements of witnesses were improperly admitted into evidence as proof of the truth of the matter asserted.

5. The court erred by denying Petitioner's motion for mistrial after two state witnesses testified regarding lie detector testing.

6. The court erred when it entered in evidence still photos from surveillance tapes without adequate foundation for their admission.

7. The trial court erred by refusing to allow Petitioner to introduce psychological and psychiatric evidence of the mental instability of

3

the State's chief witness.

8.  Petitioner was denied a speedy trial.

9.  Petitioner was denied his right to a fair trial because of ineffective assistance of counsel.

10. Petitioner was denied his right to a fair trial because of non-disclosure of grand jury minutes.

11. Petitioner was denied his right to a fair trial when the state failed to produce sufficient evidence of the Petitioner's guilt to support the jury verdict.

(# 2).

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims

4

adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

In federal habeas corpus proceedings, an error is harmful only if it "had a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  See also Sherman v. Smith, 89 F.3d 1134, 1137-41 (4th Cir. 1996)(recognizing that on collateral review of state court

convictions, many trial errors of constitutional magnitude may nevertheless be subjected to harmless error analysis).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## **STATEMENT OF FACTS AND TRIAL TESTIMONY**

The testimony at Petitioner's trial revealed the following facts:

During the late hours of December 16, 2000, Larry Linville, Danny Griffey, Erica Mason, and Brandon Beverly left together from a party in Boone County, West Virginia, to buy crack cocaine in a well-known drug trafficking area of Logan County, West Virginia, known as Cora Alley.  Linville and the others purchased some drugs and spent the early morning hours of December 17, 2000 doing crack and drinking in the area near Cora Alley.

Around 5:30 a.m., on December 17, 2000, Linville and the others set out to return home to Boone County.  As they were traveling onto the entrance ramp of Route 119, the car they were traveling in ran out of gas.  They coasted backward down the ramp

and came to rest along the side of the road.  Griffey and Beverly left on foot to try to find some gas or to get a ride from someone living nearby.  One nearby resident, Ron Kingery, told Griffey he would give them a ride on his way to work, if they were still there in a few hours.  When Griffey and Beverly returned to the car with no gas, and no assistance, Linville decided to take off on foot for a nearby gas station.  (# 18, Ex. 8 at 170).

Linville never returned.  Approximately two hours later, Griffey took a ride from Mr. Kingery, who was on his way to work. On their way to the nearby Rich Oil station, Griffey saw a number of law enforcement and emergency vehicles up along a hill that ran off of the main road, in an area called Victory Point Road (also known as "Graveyard Hill").  Griffey testified that, by this time, he had become sufficiently concerned that this scene he witnessed might involve Linville.  (Id. at 176).  As soon as Griffey returned to the car and got it started, he and the others headed towards the area where Griffey had seen the emergency vehicles.

When they arrived at the scene, they saw a body covered with a sheet.  Griffey approached the law enforcement officers to find out what happened.  Griffey learned that Linville had been shot and killed.  Griffey testified that he assumed that there might be a connection between the murder and a verbal confrontation Linville had with the drug dealer from whom they had purchased the crack cocaine the night before.  (Id. at 176-77).  Griffey, Mason and

7

Beverly all gave statements to the police and later submitted to lie detector and gun residue testing. Each of them were ultimately cleared of any involvement in the murder.

On Monday, December 18, 2000, Brian Knox, a student at Logan High School, bragged to a fellow student, John Meade, that he had killed Larry Linville. According to the prosecutor's opening statements at trial, John Meade then told a friend what Knox had told him and Meade's friend called the police. Neither Meade, nor his friend, testified at trial, so these details are unclear.

Police questioned Brian Knox, who stated that he did not kill Larry Linville, and that he was only boasting. Knox told police he spent the evening of December 16, 2000 with Ryan Jones, then went home for the night around 11:30 p.m. Knox told police he stayed in for the rest of the night and was at home on the morning of December 17th. (Id., Ex. 9 at 180-183).

Sometime on the 17th, shortly after the murder, William West told the same Ryan Jones that he had been involved in the Linville murder.[1] When police questioned Jones in connection with Brian Knox's statements, Jones knew West was involved but did not tell police what he knew. After Jones told his father about what West had told him, his father took him back to the police to make a

_____

[1] According to Respondent's Memorandum of Law, the official case record is missing four pages of Ryan Jones' testimony (# 18, Ex. 10 at 6-10 is missing), which apparently contains crucial elements of testimony about the chain of events between the time of the murder and when West told him about the crime.

statement.  (<u>Id.</u>, Ex. 10 at 10-11).

After taking Jones' statement, the investigating officers immediately sought out West for questioning.  West initially denied involvement in the crime.  However, after a second interrogation a few days later, West admitted to his participation in the crime and gave two other statements about what occurred on the day of the murder.  (<u>Id.</u>, Ex. 8 at 151).  The material differences in those statements will be discussed <u>infra</u>.

According to West's trial testimony, West and Petitioner met earlier in the evening of December 16th at the home of Xzambria Bryant.  West and Petitioner spent the evening at Bryant's where they and others drank and did drugs until the early morning.  At approximately 6:30 a.m. on December 17th, everyone at the party except for West and Petitioner left Bryant's house to go to eat at Shoney's.  (<u>Id.</u>, Ex. 10 at 49-51).

After the others left, West and Petitioner drove to the nearby Rich Oil station.  West testified that, while they were parked in the lot at the gas station, "some big guy" approached the car and tried to open the back door.  (<u>Id.</u> at 53).  West stated that Petitioner "pulled out his gun and told [the man, (who was Linville)] he was going to shoot him and the dude said 'I don't want to see no gun.'"  (<u>Id.</u>)  Linville then retreated from the car and took off on foot.  When West and Petitioner subsequently left the gas station, they saw Linville walking along the side of the

road carrying a gas can.  Petitioner ordered West to pull over and Petitioner offered Linville a ride, which he accepted.  (<u>Id.</u> at 55).

According to West, instead of taking Linville back to the broken down car, Petitioner told West to turn off the main road onto Victory Point, a small side road that led up a hill to a church.  Petitioner ordered Linville to get out of the car.  Once Linville got out of the car, Petitioner fatally shot Petitioner one time with what was later identified by shell casing evidence as a 9 mm semi-automatic weapon.  (<u>Id.</u>, Ex. 10 at 56, 136).  According to West's testimony, after Petitioner shot Linville, Petitioner stated, "I needed that."  (<u>Id.</u> at 65).

Petitioner and West drove away from the scene, but Petitioner ordered West to return to the location of Linville's body, where they stopped and switched seats.  West testified that Petitioner then ordered West to shoot at Linville's body "because he didn't want me to tell on him."  (<u>Id.</u> at 57).  Linville was on the ground in the fetal position.  West said he shot at him towards the upper back of his leg.  (<u>Id.</u> at 58).  West and Petitioner returned to Xzambria Bryant's house while Bryant and the others were still at Shoney's.  When West departed Bryant's later in the morning, he went to the home of Ryan Jones.

West's trial testimony was substantially similar to the last statement he gave to the police.  In his second statement, given on

10

December 22, 2000, West admitted that he was in the car with Petitioner.  West claimed that Petitioner fired both shots at Linville, as Linville walked along the side of the road.  (# 23-3 at 61).

During Petitioner's trial, the only direct evidence of the crime that was introduced was West's eyewitness testimony.  Other than one particle of gun powder residue found on the driver's side of the car, there was no physical evidence that implicated either West or Petitioner.  (Id., Ex. 8 at 118).  The murder weapon was never recovered.

In order to bolster the credibility of West's testimony and develop the facts of the case, the State introduced video surveillance footage from the Rich Oil gas station and another gas station in the vicinity where Petitioner had purportedly been earlier that morning, sales receipts, and testimony from witnesses who corroborated the State's version of events surrounding the crime.  The medical examiner also bore out West's account and several witnesses testified that Petitioner had been seen in possession of a gun matching the description of the murder weapon. The whereabouts of the people involved in the events surrounding the crime were confirmed and corroborated by several witnesses. The undersigned notes, however, that almost every trial witness had previously given several statements to police and to an investigator for the defense, which contained different accounts of

11

the events of that night.

Xzambria Bryant, Shahtekia Brown, and Shahrekia Brown[2] testified about the events of the night before the murder.  All three testified that West and Petitioner were at a party at Bryant's house that night and into the next morning.  All three testified that they, and another male, who did not testify at trial, went to Shoney's at approximately 6:30 a.m., without West and Petitioner.  (Id., Ex. 8 at 226-32; Ex. 10 at 214).  The Brown sisters had mistakenly stated in their prior statements to police that Willie West had been with them at Shoney's, but, at trial, they clarified that Mr. West was not with them, and that Mr. West was still at Ms. Bryant's apartment with Petitioner when they left for Shoney's.  (Id., Ex. 10 at 39, 75).

Employees of Shoney's testified to seeing customers matching the description of Bryant and the others at times consistent with their testimony.  (Id., Ex. 9 at 98-115).  Ms. Bryant and the Browns also testified that, when they returned from Shoney's, which was after the time of the murder, West and Petitioner were at Bryant's house.  (Id., Ex. 8 at 233; Id., Ex. 9 at 41, 74).

The jury was shown video surveillance tapes from the Rich Oil station from the morning of the murder which showed a man matching

_____

[2]  The names of the Brown sisters, who are twins, are spelled differently throughout the record of the case.  However, it appears from the statements that they gave to police in which they spelled their names, that these are the correct spellings of their names.

Linville's description entering and exiting the store.  A sales receipt matching Linville's transaction for the purchase of gas at 7:03 a.m. was also introduced into evidence.  (Id., Ex. 10 at 199-201).  Testimony and statements of Rich Oil employees established that Linville was at the store that morning.  (Id., Ex. 9 at 150-78).  An investigating officer who watched the video tapes was also able to identify Linville in the footage taken the morning of the murder.  Ron Kingery, who gave Griffey a ride on the morning of the murder also testified consistently with Griffey's statements. (Id., Ex. 10 at 172).

The jury also heard testimony from Brian Knox and his parents. Brian testified that he spent the day of December 16, 2000, at the home of Ryan Jones, and that he went home around 11:30 p.m.  (Id., Ex. 9 at 182-183).  Knox's stepfather also testified that Brian came home between 10:15 and 10:45 p.m., went straight to bed and did not get up until later the next morning, when they watched football together.  (Id. at 192-193).  Knox's mother, however, told police that he was not home on the morning in question.  (Id. at 201-208).

Testimony was offered by Xzambria Bryant that Petitioner had a gun similar to the murder weapon at her apartment on the night of the murder.  (# 18, Ex. 8 at 235-37).  Petitioner's girlfriend, Crystal Fuller, also testified that Petitioner had a "small handgun" in his boot at her house a few weeks prior to the murder.

13

(<u>Id.</u>, Ex. 10 at 24).  Although Shahrekia Brown testified that she did not remember anything about seeing a gun on the night of the murder, her previously signed statement given to the police indicated that she did see a gun that night.  (<u>Id.</u>, Ex. 9 at 36-39).

Other testimony showing that Petitioner was seen in the possession of a gun shortly before the murder was presented to the jury.  Following an <u>in</u> <u>camera</u> hearing, and pursuant to Rules 403 and 404(b) of the West Virginia Rules of Evidence, the trial court permitted the State to introduce evidence that Petitioner had attacked a man named Phillip Workman by hitting him in the head with a gun similar to the murder weapon on the night before the crime.  Workman testified that Petitioner hit him on the left side of his head with the gun and then "cocked it back and was about to shoot him."  (<u>Id.</u>, Ex. 10 at 36).  Willie West's testimony corroborated these facts.  However, two other witnesses testified that they never saw a gun during this altercation, and a photograph taken of Workman's head approximately a week after this alleged incident demonstrated bruising on the right side of Workman's head, not the left.

The State was permitted to introduce evidence of Petitioner's altercation with Workman for the limited purpose of "establishing the opportunity for the defendant to commit the crime for which he is charged."  (<u>Id.</u>, Ex. 9 at 121).  The jury was given a limiting

14

instruction to this effect.

At the time of the murder, Petitioner, who was right-handed, had a cast on his right arm because he had broken his right index finger.  In Petitioner's case in chief, the defense provided the testimony of the orthopedic surgeon who treated Petitioner's broken finger.  Using a cast similar to that worn by Petitioner at the time of the murder, the doctor testified that Petitioner's right index finger would have been immobilized.  (<u>Id.</u>, Ex. 11 at 13).  On cross-examination, the doctor admitted that the cast did not prohibit movement of Petitioner's other fingers or thumb, and that he had full use of his left hand.  (<u>Id.</u> at 16-17).

The State medical examiner also testified.  The medical examiner confirmed that Linville died of a bullet wound to the chest that penetrated his aorta and that he most likely died within minutes.  Linville also had a gunshot wound to the upper left leg, which was not fatal, and which appeared to have ricocheted off of a hard surface before entering Linville's leg.  This was consistent with Willie West's testimony that he shot at the body while it was on the pavement.  (<u>Id.</u>, Ex. 10 at 170-173).

Petitioner did not testify at trial.  However, his prior statement to police, in which he denied any involvement with the crime, was read into evidence.  (<u>Id.</u> at 235-237).

**ANALYSIS**

**A.   Petitioner's petition contain non-cognizable claims.**

Petitioner has submitted his direct appeal and the "Amended Petition for Habeas Corpus Ad Subjiciendum" (hereinafter the "amended circuit court habeas petition"), filed by his state court habeas counsel in the Circuit Court of Logan County, in support of his claims for federal habeas corpus relief.   Other than a cursory statement in each of the grounds for relief set forth in the amended habeas petition stating that Petitioner's right to a fair trial was denied, Petitioner's documents almost exclusively challenge state trial court rulings under state law.   Respondent's Memorandum of Law in support of his Motion for Summary Judgment further states:

> Because most of Petitioner's claims are matters of state law, they do not present an issue that raises a constitutional issue.   Violations of state law and procedure which do not infringe specific federal constitutional protections do not raise an issue that can form the basis for federal relief.   See, *e.g.*, Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Weeks v. Angelone, 176 F.3d 249, 262 (4th Cir. 1999)("Therefore, when a petitioner's claim rests solely upon an interpretation of state case law and statutes, it is not cognizable on federal habeas review.").

> Also, most of Petitioner's claims are insufficiently pled to set forth a federal claim.   Many of the claims simply cite to allegedly erroneous evidentiary rulings by the trial court with little or no supporting argument or controlling authority.

(# 19 at 17).   Respondent argues that "[t]his consistent lack of

16

controlling legal authority or citation to a legitimate violation of a constitutional protection renders the instant petition ripe for dismissal as insufficiently pled." See Lookinbill v. Cockerell, 293 F.3d 256, 269 (5th Cir. 2002), citing McFarland v. Scott, 512 U.S. 849, 856 (1994)("Federal courts can summarily dismiss any habeas petition that appears legally insufficient on its face." (Id. at 18).

In the alternative, Respondent asserts that, even if the petition is not suitable for summary dismissal, "the lack of controlling authority and federal issues argued will be grounds alone on which to dismiss several if not all of the claims." (Id. at 19).

Grounds One, Three, Four, Five, Six, Seven and Eight of Petitioner's section 2254 petition assert only that the trial court erred in making various rulings under state evidentiary and statutory law, and do not in any way implicate any of Petitioner's federal constitutional rights. Petitioner attempts to rectify this problem by citing to various federal constitutional rights he claims were violated and to federal case law concerning such claims in his Response to Respondent's Motion for Summary Judgment. Petitioner's attempt is in vain, however, as the state habeas courts decisions, which this court is charged with reviewing, are not based on federal constitutional law, but rather, state evidentiary law.

17

The undersigned proposes that the presiding District Judge **FIND** that Grounds One, Three, Four, Five, Six, Seven, and Eight rely solely on state law and fail to state claims that are cognizable in federal habeas corpus. Accordingly, it is respectfully **RECOMMENDED** that these claims be summarily dismissed for failure to state a claim under 28 U.S.C. § 2254.

Should the presiding District Judge find, however, that Petitioner's claims for relief as stated in Grounds One and Three through Eight should be reviewed on the merits, they will be further addressed below.

**B.    Ground One - Denial of Motion for New Trial and Ground Eleven - Insufficiency of Evidence.**

In Ground One of his federal petition, Petitioner claims that the trial court erred in refusing to grant his motion for a new trial. Petitioner's federal petition form incorporates "Appendix B & D under Ground One" in support of this claim. Appendix D to Petitioner's federal petition is his amended circuit court habeas petition, and Appendix B is Petitioner's habeas petition for appeal. The undersigned notes that the grounds raised in Petitioner's amended circuit court habeas petition do not match up in numbering with those raised in his habeas appeal or in the present federal petition. Thus, "Ground I" in the amended circuit court petition is not the same claim for relief as that raised in Ground One of the federal petition. The undersigned will attempt to identify the proper claims in the amended circuit court

18

petition, when addressing Petitioner's claims in the order they appear in the federal petition.

Petitioner's claim concerning the denial of his motion for a new trial is addressed in his amended circuit court petition in a section numbered "XI" on page 17 of the amended petition. (# 2-2 at 74, Appx. D at 17). This claim, as stated in the amended circuit court petition, states:

> Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because THE TRIAL COURT DENIED YOUR PETITIONER'S MOTIONS FOR A NEW TRIAL AND JUDGMENT OF ACQUITTAL. It should be obvious to even a casual observer from the reading of the trial transcript that the State did not prove beyond a reasonable doubt all of the elements necessary for First Degree Murder. Even if you believe the testimony of Willie West, the elements of malice and premeditation were not even close to meeting the State's burden of proof beyond a reasonable doubt.

(<u>Id.</u>)

Respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that "the petitioner must come forward with evidence the claim has merit. Allegations amounting to nothing more than conclusions provide no basis for an evidentiary hearing. <u>Nickerson v. Lee</u>, 971 F.2d 1125 (4th Cir. 1992)." (# 19 at 20). Respondent asserts that this claim is insufficiently pled and fails to raise a federal issue. (<u>Id.</u>)

Petitioner's Response to the Motion for Summary Judgment appears to combine his claim about a motion for a new trial with his claim in Ground Two concerning racial discrimination and juror

bias, which will be addressed below.  (# 23 at 7).

Turning back to Petitioner's initial focus of his claim concerning the denial of his motion for a new trial, Petitioner asserted that there was insufficient proof of the essential elements of First Degree Murder, particularly the elements of malice and premeditation.  In Ground Eleven of his federal petition, Petitioner also asserts that he was denied a fair trial when the State failed to produce sufficient evidence to support the jury's guilty verdict.  Petitioner also incorporates Appendix B and D in support of that claim.

In his amended circuit court petition (Appendix D), Petitioner addressed that claim in section "XII" stating as follows:

> Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE OF YOUR PETITIONER'S GUILT TO SUPPORT THE JURY'S VERDICT.  Any Prosecutor is charged with the duty of making certain that the Defendant receives a fair trial.  Furthermore, even if you combine the circumstantial evidence with the direct evidence in this case, there was insufficient physical evidence that linked your Petitioner to this crime.  The only direct evidence which linked your Petitioner to this crime was the oral testimony of Willie West who gave at least three different versions of Petitioner's alleged involvement in this crime.  This attorney is mindful of the fact that people can be convicted when only one witness orally testifies that a co-defendant participated in the crime itself.  However, when you couple the lack of any corroboration of the testimony of Willie West with the circumstantial evidence in this case, the Jury simply did not have enough evidence to convict your Petitioner.  Consequently, it would appear that the Jury went outside the scope of the evidence to find Petitioner guilty based upon reasons as listed above.

(# 2-2 at 74-75, Appx. D at 17-18).

20

Respondent's Memorandum of Law in support of his Motion for Summary Judgment does not address Ground Eleven. Nor did the Circuit Court specifically address Petitioner's sufficiency of evidence claim in its Order Denying Petitioner's Amended Petition for Habeas Corpus. When a State court fails to address an issue, or fails to articulate a rationale behind its ruling, the federal courts "must independently review the record and the applicable law; however, the review is not a de novo review. See Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000). Rather, it is a deferential review to determine if the State court's decision is legally and factually reasonable. Id. The undersigned will conduct such a review of the merits of Petitioner's claims that he was convicted based upon insufficient evidence.

In reviewing the sufficiency of the evidence to support a State criminal conviction on a due process challenge in a federal habeas proceeding, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307 (1979). A petitioner is entitled to relief only where no rationale trier of fact could have found such proof of guilt. Id. at 324.

When conducting a review of the evidence, the court must "consider circumstantial as well as direct evidence and allow the

government the benefit of all reasonable inferences from facts proven to facts sought to be established" United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982), and that the jury, not the court, is to determine the credibility of the witnesses and resolve factual conflicts. Wiggins v. Corcoran, 288 F.3d 629 (4th Cir. 2002). Using this standard, and upon review of the entire record of this case, the undersigned proposes that the presiding District Judge **FIND** that there was sufficient evidence upon which to convict Petitioner of First Degree Murder.

Although the State's evidence rested largely upon the eyewitness testimony of Petitioner's co-defendant, Willie West, numerous witnesses placed Petitioner at a party at Xzambria Bryant's house with Willie West in the hours before the murder. Petitioner and West were together at the party and the various witnesses who attended the party testified that Petitioner and West remained at Bryant's house when everyone else left to go to Shoney's at approximately 6:30 a.m. Testimony from the party attendants also indicated that Petitioner possessed a small handgun at Bryant's apartment on the night of the murder.

West's testimony that he and Blackmon left Bryant's house and drove to the nearby Rich Oil Station is confirmed by the Rich Oil Station's video surveillance and store receipts, which also confirmed that the victim, Larry Linville, purchased gasoline at the Rich Oil Station at or about 7:03 a.m. Furthermore, the nature

of the victim's wounds was consistent with Willie West's testimony about how the crime occurred.  Moreover, West's statement that they turned off of the main road, away from where Linville's stranded vehicle was located, and the fact that Petitioner stated, "I needed that" after shooting Linville supports the elements of premeditation and malice aforethought.

Accordingly, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, in accordance with <u>Jackson v. Virginia</u>.  Based upon the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that there was sufficient evidence for a rationale trier of fact to find that Petitioner shot and killed Larry Linville with malice aforethought, premeditation or deliberation.

The undersigned further proposes that the presiding District Judge **FIND** that, after an independent, but deferential, review of the record and the applicable law, the State courts' decisions denying Petitioner habeas corpus relief on these grounds were neither legally nor factually unreasonable.

For the reasons stated herein, the undersigned further proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact concerning Petitioner's claims concerning the sufficiency of the evidence, and that Respondent is entitled to judgment as a matter of law on each of those claims.

Accordingly, it is respectfully **RECOMMENDED** that the District Court **GRANT** Respondent's Motion for Summary Judgment as to Grounds One and Eleven of Petitioner's section 2254 petition.

**C.   Ground Two - Denial of Right to a Fair and Impartial Jury.**

In Ground Two of his section 2254 petition, Petitioner alleges that he was denied the right to a fair and impartial jury and the right to due process under the Fourteenth Amendment of the United States Constitution as a result of alleged racial discrimination and the bias of jury members against the use of drugs and alcohol. Petitioner relied upon the arguments made in his state habeas corpus petitions in support of this claim (Appendices B and D), as well.

The undersigned notes that Petitioner's claim of juror bias related to the use of alcohol and drugs was not addressed at all in his amended circuit court habeas petition; however, Petitioner's counsel did address that claim in his direct appeal.  Therefore, it is exhausted.  Petitioner also addressed that specific claim in his habeas appeal.

Petitioner's amended circuit court habeas petition addressed this issue in section "IX," stating:

> Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because of THE RACIAL DISCRIMINATION AND BIAS OF JURY MEMBERS WHICH WAS DENIED DURING PRE-TRIAL VOIR DIRE.  It would appear that this jury had their own racial views regarding the disposition of African Americans as violent and unlawful people. This attitude appears corroborated when the jury

24

requested security before they delivered the verdict. There was evidence at trial that indicated that African Americans by nature are unlawful and violent.

(# 2-2 at 73, Appx. D at 16).

Petitioner's habeas appeal further argued as follows:

The Sixth and Fourteenth Amendments of the United States Constitution and Article III, Sections 10 and 14 of the Constitution of the West Virginia guarantee the accused in criminal proceedings the right to a fair trial of the charges against him.  This right includes the promises that he will be confronted by the witnesses against him and that decisions in the jury room will be based only on evidence presented in the controlled environment of the Courtroom.

A critical component of a fair trial is an impartial jury.  "This requirement 'goes to the fundamental integrity of all that is embraced in the Constitutional concept of trial by jury.'" (<u>Turner v. State of Louisiana</u>, 397 U.S. 466, 472, 85 S. Ct. 546, 549, 13 L. Ed.2d 424, 429 (1965); <u>State ex rel. Trump v. Hott</u>, 187 W. Va. 749, 421 S.E.2d 500 (1992).  ". . . the 'evidence developed' against a defendant shall come from the witness stand in a public Courtroom where there is full judicial protection of the Defendant's right of confrontation, of cross examination and of counsel." (<u>Turner v. Louisiana</u>, supra, at Pg. 472-473.  <u>Parker v. Gladden</u>, 383 U.S. 363 (1996)).  The Court is required to enforce this right of protection by close supervision of the process.

\* \* \*

The "indifferent" juror is one who comes to perform his duty as a jury member unencumbered by personal prejudice or bias or the pre-trial bias of other jury members which would prevent him from reaching a decision of the Defendant's fate solely on the basis of evidence presented at trial.  "An allegation that one or more jurors was initially biased or prejudiced against a party may provide a basis for attacking the verdict on appeal."

(# 2-2 at 15-16, Appx. B at 11-12).

Concerning the alleged bias of certain jurors regarding the use of drugs and alcohol, Petitioner presented that issue in his direct appeal as follows:

> Evidence of extrinsic misconduct has been identified to include a showing that a prejudice or bias of the juror  regarding the parties was initially presented before deliberations began.  See [State v. Scotchel, 168 W. Va. 545, 285 S.E.2d 384 (1981) or "... a showing of matters  occurring during the trial not essentially inhering in the verdict, that is, not falling within or pertaining to the legitimate issues of the case" which may have influenced the jury.  76 Am. Jur. 2d Trial §1223 (1975).

> Voir dire, conducted by the Court, included the question "There may be evidence in this case of use of drugs and alcohol by certain persons.  Who does not feel they could be fair in this case simply because there would be testimony about the use of drugs and alcohol?"  Individual voir dire of a juror on an unrelated issue revealed that she could not set aside her feelings regarding drugs to make a fair decision.  She was dismissed for cause.  The [remaining] jurors, questioned as a group responded in the negative.

> The State's case against the Defendant presented incidences of extraordinarily heavy use of [drugs] and alcohol.  Critical and material evidence was repeatedly presented by the State of a party which occurred in the early morning hours on the day of the crime.  Graphic testimony of excessive consumption of drugs and alcohol at the party was given by State witnesses.  Four of them testified that the Defendant was a participant at the party.

> The Court arranged daily lunch for the jury members at a local restaurant.  Certain jury members refused to eat at the restaurant designated by the Court because, it was their understanding, the restaurant served alcohol.  Because of limited facilities available to the Court in the rural community, these jurors were required to eat box lunches in the jury room throughout the trial.  These facts were not announced by the Court or placed on the record.

26

Defendant argues that if the use of alcohol by others was so abhorrent to the jury members that they would refuse to go into an establishment where alcohol was served, this predisposition would affect their "indifferent" decision-making process. The voir dire proposed by the Defendant would have asked "Do you have a strong objection to the use of alcohol and drugs." The Judge chose not to ask this question and substituted the less probative ". . .Is there anybody that doesn't think they can be fair to everybody in this case because of testimony about the use of drugs and alcohol?" Even under the Judge's less demanding inquiry, the jurors who refused to go into a local restaurant simply because alcohol was served there were not truthful when they said they would not be influenced by the use of alcohol. They were required to listen to days of testimony regarding alcohol and drug usage by the Defendant and his associates. A strong probability exists that the jurors were prejudiced against the Defendant by their undisclosed bias.

(# 18, Ex. 3 at 23-24). The SCAWV refused Petitioner's Petition for Appeal. Thus, there is no discussion of this claim by the SCAWV. Petitioner repeated this claim in his habeas appeal, even though it was not specifically addressed in his amended circuit court petition. (# 2-2 at 16-18, Appx. B at 12-14).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment addresses the claims of juror discrimination and bias as follows:

In support of this ground, Petitioner claims that certain events that occurred at trial indicate racial bias was an element at trial. Petitioner cites to the fact that the crime was a black on white murder in an overwhelmingly white community. Petitioner argues that spectators were seated along racial lines and that before the jury read their verdict, they sent a note to the judge asking for added security. Petitioner claims that because the spectators behind the [defense] were black, the jury's request indicated they considered the black spectators to be violent and dangerous.

27

Petitioner also argues that the jury was prejudiced by the role of drug and alcohol use in the evidence presented at trial.  In support of this claim, Petitioner argues that although jury members stated in voir dire that they would not be prejudiced by testimony about drug and alcohol consumption, they displayed a predisposition to the contrary when several of them refused to eat in a restaurant that served alcohol during the trial.  This alone, Petitioner argues, supports a finding that the jury was prejudiced towards alcohol consumption sufficient to make a showing of juror bias.

(# 19 at 21).

As noted by Respondent, absent contrary indications, jurors are presumed to be impartial.  Poynter v. Ratcliff, 874 F.2d 219, 221 (4th Cir. 1989).  The defendant bears the burden of showing a strong possibility of juror bias.  Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987).  "The bias of a prospective juror may be actual or implied; that is it may be bias in fact, or bias conclusively presumed as [a] matter of law."  Conway v. Polk 453 F.3d 567, 585 (4th Cir. 2006) citing United States v. Wood, 299 U.S. 123, 133 (1936).  (# 19 at 21-22).  Respondent's Memorandum further quotes the Conway opinion:

The Court has explained that a juror's bias may be established by showing (1) that the juror "failed to answer honestly a material question on voir dire"; and (2) that a "correct response [to that question] would have provided a valid basis for a challenge for cause."  See McDonough Power Equip. Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed.2d 663 (1984)(the "McDonough test").  Additionally, a litigant must show that the fairness of his trial was affected either by the juror's "motives for concealing [the] information" or the "reasons that affect the juror's impartiality."  Id.

453 F.3d at 585.  (Id. at 22).

28

Respondent's Memorandum further states:

> Although a fair and impartial jury is fundamental to a fair trial, claims of juror bias have been held to be subject to a harmless error analysis in this jurisdiction. <u>Sherman v. Smith</u>, 89 F.3d 1134, 1139 (4th Cir. 1996)(en banc)[contrary citations omitted]. However, no federal court has held that claims of racial bias are subject to harmless error analysis.

(<u>Id.</u>)  Respondent's Memorandum then addresses the facts of this case:

> In this case, the trial court denied Petitioner's motion for a new trial based on, <u>inter alia</u>, juror bias without holding a hearing to determine whether there was actual bias among the jurors.  No questions about potential racial issues or prejudice were raised during voir dire. [FN 8] No omnibus habeas corpus hearing was conducted in Petitioner's state habeas corpus proceedings.  Therefore, no record has been developed on this issue.
>
> [FN 8 - Because trial counsel did not raise the issue of racial bias prior to trial, this claim would be considered waived under state law. <u>State v. Tommy Y, Jr.</u>, 637 S.E.2d 628, 637 (W. Va. 2006) citing <u>People v. Henry</u>, 627 N.E.2d 225, 227-28 (Ill. 1993)("[F]ailure of the appellants to raise the question of the disqualification of the juror . . . before trial by advising the court or making some appropriate objection or motion to invoke a ruling by the court, with a waiver."); <u>see</u> respondent's argument on waiver, <u>infra</u> at Ground Four.)  Arguably, however, the facts supporting this claim (the juror's notes, the seating of the spectators) did not develop until after the commencement of the trial proceedings.]
>
> Although the Supreme Court has held that juror bias can be presumed, the Fourth Circuit has nonetheless taken this to mean that implied bias must be "established" by a showing that a juror intentionally concealed information that would otherwise disqualify him or her from sitting under the <u>McDonough</u> test.  In this case, no record was developed on this issue, which prevents the application of the <u>McDonough</u> test.  Therefore, under the Fourth Circuit's standards, a claim of juror bias cannot

form the basis for federal relief without a showing on the record that a biased juror was seated.

However, implied bias has been held to raise an issue of juror bias. Implied or presumed bias means " a bias attributable in law to the prospective juror regardless of actual partiality." <u>United States v. Wood</u>, 299 U.S. 123, 134 (1936).

(<u>Id.</u> at 22-23).

With regard to the racial bias claim, Respondent states:

Logan County, West Virginia is a rural, predominately white area of West Virginia where certain social conditions exist that could, but not necessarily, support an argument that racial bias could be a risk for an African American standing trial. The crime was a black on white murder. The jury was all white as was the jury pool. The spectators were seated according to race giving the courtroom a segregated appearance. The jury in this case adjourned before lunch and returned a conviction that carried a life sentence without the possibility of parole against a 20-year-old man, and ate their meal, all by 2:15 in the afternoon. The jury requested added security for when they announced a verdict of guilt against the black defendant. Whether racism can be presumed under the circumstances present in Petitioner's case is one issue. Whether race played a role in the verdict is another. Neither has been demonstrated under the present set of facts. At best, this claim is speculative and at worst, self-serving. However, speculation based on perceptions has never supported relief on a claim of juror bias and Petitioner has cited no controlling authority to the contrary.

The reality of the judicial system is that there will never be any infallible method for eliminating all potential prejudice from the judicial system. Nonetheless, the courts have provided no guidance on whether certain circumstances create a presumption of a certain amount of inherent racism and whether or not there is an acceptable level of racism in a fair trial. Therefore, under the prevailing authority on this issue, the presumption is that jurors were impartial and nothing has been developed on the record or in Petitioner's argument to rebut that presumption. "[I]n the end, no judge can know for certain what factors led to the jury's

verdict." <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 284
(1993)(Rehnquist, C.J., concurring)(discussing appellate
court review applying a harmless error analysis).

(<u>Id.</u> at 23-24). Concerning the issue of juror bias against

alcohol, Respondent's Memorandum of Law further states:

> With regard to the jurors' refusal to eat lunch in
> a restaurant that served alcohol, as demonstrated by the
> voir dire, the jurors were questioned about their
> attitudes towards alcohol and drug consumption. No
> jurors were seated who claimed that testimony about drug
> or alcohol abuse would affect their ability to be
> impartial. Therefore, the presumption is that they
> followed the instructions of the court and were truthful
> during voir dire. Without a demonstration on the record
> that a biased juror was seated, any argument on this
> claim is based on pure speculation. That is not
> sufficient to form the basis of relief in federal habeas
> corpus.

(<u>Id.</u> at 24).

Petitioner's Response to Respondent's Motion for Summary

Judgment addresses Petitioner's claim of racial discrimination and

juror bias in pertinent part, as follows:

> Petitioner's trial jury (all Caucasians) was
> selected from a venue that had 2/3's coming from areas in
> the County where no African America can walk the streets.
> Moreover, during "voir dire," there was no question
> concerning their biases and prejudices asked concerning
> African Americans. Yet, when a question was asked
> concerning "alcohol and drugs," many responded they had
> no biases or prejudices. Yet, when the trial jury
> selected was to go to lunch (a place extremely close to
> the Courthouse that also served alcohol), the jurors
> refused to go because the establishment served alcohol,
> and demanded lunch be brought in and served to them.

> <u>Exhibit 13</u> Juror List

> Now if the jury felt so adamant about alcohol that
> they could not eat lunch in a place deemed adequate by
> the Court, one has to strongly infer that their racial

> biases and prejudices would severely compromise any trial that they were responsible for deciding fairly, especially if the victim was Caucasian and the accused was a young African American.
>
> Of the twenty-eight (28) people "supposedly selected from the Master List composed of the citizens of Logan County, not one (1) person of a recognized minority was called upon to be in the Petitioner's petit jury trial selection.

(# 23 at 7-8).  Petitioner adds:

> The State made the comment that the reason there were no minorities called, was because Logan County is only three (3) to four (4) percent black.  Of that three (3) to four (4) percent, according to the State, Petitioner's sure there were a number of qualified people of minority descent who could have been called upon. Where was the three (3) to four (4) percent in the jury pool?

(Id. at 8).

Petitioner's Response appears to be raising an equal protection claim concerning the jury pool, not a claim of actual bias by jurors on his panel.  Such a claim was not exhausted in his direct appeal or his state court habeas petitions and, thus, is not reviewable by this federal court.  Accordingly, it will not be further addressed herein.

The State habeas court made the following findings on the juror bias issue:

> a.   The Petitioner fails to make a showing of racial bias beyond noting that generally the black spectators sat behind the defense table and the white spectators sat behind the prosecuting attorney and that the jury requested security when the trial was over.

32

b.   The Judge would not find this to constitute evidence of racial bias as it is typical for the family and supporters of the victim (who was white) to set [sic; sit] behind the prosecutor and for the family and supporters of the defendant who is black to set [sic; sit] behind the defense team.  This happens in most trials unless the crowd is so large that spectators cannot choose their seats.  My review of the voir dire doesn't show evidence of racial bias but rather focuses on attitudes toward drugs and alcohol and criminal charges involving jurors and their families.  I would also note that defense counsel did not apparently see the need for greater explanation of this area during voir dire.  It might have been a tactical decision on Defense Counsel's part to not bring up questions of potential racial bias during voir dire at [sic] to avoid drawing attention to what was presumably not an issue.

c.   I simply would not see any racial bias [a]ffecting the trial in the request of the jury that there be security provided them following a murder trial.

(# 18, Ex. 5 at 9-10).  The state habeas court's decision did not specifically address the issue of bias against drug and alcohol use.

The undersigned proposes that the presiding District Judge **FIND** that the state court's decision denying Petitioner habeas corpus relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Ground Two of Petitioner's section 2254 petition.

**D.   Ground Three - Admission of Rule 404(b) evidence.**

In Ground Three of his section 2254 petition, Petitioner contends that the trial court erred by granting the State's motion to introduce unrelated bad acts of Petitioner to suggest that he behaved in a consistent manner on the night of the crime.   In his amended circuit court habeas petition, Petitioner addressed this claim in section "V" as follows:

> Your petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because THE STATE WAS ALLOWED TO INTRODUCE UNRELATED BAD ACTS OF YOUR PETITIONER TO SUGGEST THAT HE BEHAVED IN A CONSISTENT MANNER THE EVE OF THE CRIME.  During the trial, the State was allowed to introduce the testimony of Phillip Workman, Tyrone Miller, and Trooper L. Deskins concerning an alleged altercation that your Petitioner was involved in with Phillip Workman on the evening of December 16, 2000.  This altercation allegedly involved the use of a gun by your Petitioner during this altercation.  It is undisputed that no shots were fired during the altercation.

(# 2-2 at 71-72, Appx. D at 14-15).  Petitioner further addressed this claim in his habeas appeal petition as follows:

> The State was allowed, over Petitioner's objection, to introduce evidence of an incident that allegedly occurred on the night of December 16, 2000.  Testimony of the State's witnesses was inconsistent and unreliable but the Prosecutor argued that Petitioner struck Phillip Workman on the head with a gun during the incident.  In Pre-Trial Motions Petitioner argued that the State was using the evidence of this altercation to show that Brandon Blackmon was a bad person and that he behaved in a manner on the morning of December 17, 2000, which was consistent with the manner in which he allegedly behaved in Cora Alley the night before.  The State argued in the 404(b) hearing that their intent in presenting the evidence was " . . . to prove on the day immediately preceding this killing, basically these actions of the two co-defendants kind of lasted through the night into

34

> the next morning when Mr. Linville was actually killed."
> The use of the evidence for this purpose is strictly
> prohibited by West Virginia Rules of Evidence, Rule
> 404(b). (Also see, <u>State v. Hanna</u>, 180 W. Va. 598, 607,
> 398 S.E.2d 640, 649 (1989), <u>State v. McGinnis</u>, supra.)

(# 2-2 at 21-22, Appx. B at 17-18). Petitioner's appeal petition

further details the State's argument that the evidence of this

altercation was admissible to show that Petitioner had the

"opportunity" to commit the instant murder because he had possessed

a gun the night before the instant crime and showed his ability to

use and cock a gun with his left hand. Petitioner further details

the inconsistencies in the testimony of the witnesses on this

issue, stating:

> Phillip Workman testified that Brandon Blackmon hit him
> on the back of the left side of his head with a gun.
> State eyewitness T.J. Miller testified Brandon Blackmon
> had no gun. State eyewitness Willie West testified
> Brandon Blackmon hit Phillip Workman in the front of the
> head in the temple area with a gun. West testified that
> Blackmon stood over Workman, cocked the gun and pointed
> it at him. Workman denied that Blackmon did more than
> point a gun at him after the blow. The witness[es]
> agreed only to the point that Brandon Blackmon was
> wearing a cast on his right arm.

(# 2-2 at 22-23, Appx. B at 18-19). Petitioner further argued that

the prejudicial effect of the evidence and the stigma of Cora Alley

in the Logan County community outweighed any probative value the

evidence could have, and was used to inflame the jury. (# 2-2 at

23-26, Appx. B at 19-22).

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment addresses this claim as follows:

In support of this claim, Petitioner argues that 404(b) did not provide for the admission of evidence that he attacked Phillip Workman the night before the crime. [Footnote omitted].  Petitioner also cites as support for this claim, that the State argued different grounds for the admission of the evidence at the hearing from the grounds they argued at trial.

The premise of Petitioner's argument on this claim consists entirely of challenging the admission of the challenged evidence under state evidentiary rules. However, in order to raise the specter of a violation of due process flowing from an evidentiary ruling, a petitioner must show a "violation of those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." Dowling v. United States, 493 U.S. 342, 353 (1990)(citations omitted).  State court evidentiary rulings do not rise to the level of due process violations unless they "offend . . . some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Patterson v. New York, 432 U.S. 197, 202 (1977)(citations omitted).  In Dowling, the Supreme Court found that the testimony of a victim of a prior offense of the petitioner was "at least circumstantially valuable in proving petitioner's guilt and not a violation of due process." Id.

(# 19 at 25-26).  Respondent also cites to Jones v. Conway, 442 F.

Supp.2d 113, 131 (S.D.N.Y. 2006), which states as follows:

As a threshold matter, the issue of whether an admission of uncharged crimes can ever constitute a violation of the Due Process Clause has not been decided by the Supreme Court.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5, 112 S. Ct. 475, 116 L. Ed.2d 385 (1991)("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.") Given that the Supreme Court has not held that the use of uncharged crimes would violate the Due Process Clause, the Appellate Division's rejection of this claim is hardly either contrary to or an unreasonable application of clearly established Supreme Court law. Consequently, I cannot find a due process violation because to do so would amount to the creation of a new

rule of constitutional law, which a federal court is not
permitted to do in a habeas corpus proceeding.   See
Teague v. Lane, 489 U.S. 288, 316, 109 S. Ct. 1060, 103
L. Ed.2d 334 (1989).

(Id. at 26).

Respondent also quotes the Fourth Circuit's decision in Barbe
v. McBride, 521 F.3d 443 (4th Cir. 2008), which states:

> Importantly in considering federal habeas corpus
> issues involving state evidentiary rulings, "we do not
> sit to review the admissibility of evidence under state
> law unless erroneous evidentiary rulings were so extreme
> as to result in a denial of a constitutionally fair
> proceeding." Burket v. Angelone, 208 F.3d 172, 186 (4th
> Cir. 2000).   "It is only in circumstances impugning
> fundamental   fairness   or   infringing   specific
> constitutional protections that a federal question is
> presented." Spencer v. Murray, 5 F.3d 758, 762 (4th Cir.
> 1993)(internal quotation marks omitted); see also Estelle
> v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed.2d
> 385   (1991)(explaining that "[i]n conducting habeas
> review, a federal court is limited to deciding whether a
> conviction violated the Constitution, laws, or treaties
> of the United States").   In light of these limitations on
> the scope of our inquiry, we confine our consideration of
> the Confrontation Issue to the question of whether the
> Rape Shield Ruling contravened Barbe's Sixth Amendment
> confrontation right, without examining such issues as
> whether the state circuit court properly interpreted the
> West Virginia rape shield law itself.

Id. at 452-53. Respondent argues that, in this case, "[w]hether or

not the ruling of the trial court was proper under 404(b) is

irrelevant in this forum.  The standard in federal habeas review is

whether the admission of the evidence violated due process.

Because Petitioner made no such argument, this claim fails as a

challenge to a state court evidentiary ruling." (# 19 at 27).

Respondent further argues that, even if the claim is treated as a

due process claim, it would also fail.  (Id.)

The evidence presented, both in camera and then in front of the jury, indicated that Petitioner used a weapon similar to the murder weapon to "pistol whip" and threaten Phillip Workman during an altercation in the Cora Alley area of Logan County on the night before the crime.  The fact that Petitioner was in possession of a gun in the hours before the crime was corroborated by the testimony or statements of at least three of the people who had attended the party at Xzambria Bryant's house, and Petitioner's girlfriend testified to seeing Petitioner with a gun about two or three weeks before the murder.  (Id. at 28).

At the in camera hearing, the State argued for the admission of the evidence concerning Petitioner's altercation with Workman to show "One, opportunity, in fact, he possessed the weapon, and second, the fact that he was able to manipulate and use the weapon."  (# 18, Resp't Ex. 12 at 5-6).  Respondent notes that, at the time of the crime, Petitioner had a cast on his right arm from his index finger to his upper arm.  Respondent further notes that the trial judge did not make a ruling on the admissibility of the evidence at the hearing.  (# 19 at 27).

When the State called Phillip Workman at the trial, the court ruled the testimony admissible to show "ability." (# 18, Resp't Ex. 9 at 120).  The trial court gave the jury a limiting instruction, directing the jurors to consider the evidence only for the purpose

38

of "establishing the opportunity for the defendant to commit the crime for which he is charged." (Id. at 121).  William West also testified at trial about the altercation between Petitioner and Phillip Workman (# 18, Ex. 10 at 45-47); Respondent notes, however, that West's testimony was not produced at the in camera hearing and the trial court did not include a limiting instruction concerning West's testimony.  (# 19 at 28).

Respondent's Memorandum of Law further argues:

> Although the judge did differ in his grounds for ruling the testimony admissible and the purpose the jury could consider the evidence for in the instruction, the variance is irrelevant for [the] purpose of determining whether the testimony violated due process.

> Although there was not overwhelming direct evidence of guilt at trial, every aspect of the eye witness testimony of William West was substantiated by video evidence, witness testimony, ballistics and the medical examiner's testimony.  It cannot be said that the challenged evidence was a significant factor in Petitioner's conviction.  Because West's testimony was corroborated, it would follow that if the jury determined West was credible based on substantiating testimony, it was unnecessary for the State to establish the existence of the murder weapon or Petitioner's ability to use it since the death of the victim by gunshot was sufficient to establish both.  Therefore, because of the weight and sufficiency of the evidence presented at trial to corroborate the testimony of the eye witness, any effect the challenged testimony had on the outcome of the proceedings was harmless.  See Brecht, supra.

> Petitioner has cited to no controlling authority that controverts the holding of the habeas court on this claim.  Therefore, the presumption that the findings of the habeas court are correct as a matter of federal law have not been rebutted by Petitioner.

(Id. at 28-29).

Petitioner's Response to the Motion for Summary Judgment argues that Phillip Workman, the "alleged assault victim" gave different accounts of the incident each time he gave a statement or testimony.  Petitioner asserts that this made the proposed 404(b) evidence inadmissible because it was not based upon sufficient evidence.  (# 23 at 10).  Petitioner further asserts that the evidence was admitted for an improper purpose.  Petitioner's Response states:

> The State's motion throughout all court proceedings was to argue opportunity.  Even during the Pre-trial hearing, they specifically state this fact on record to the Court, and was to seek nothing more, especially not the non-existent element of "ability."  The State candidly admitted the change.  Petitioner was given no notice before it happened.
>
> The State's "so-called" reasoning for the change was not based upon any legally recognized premise in law, yet the Court agreed to let them do so.  The State argued both words (opportunity and ability) mean the same thing.

(Id. at 11).  Petitioner then cites to the definitions of each term in Webster's II New College Dictionary.  (Id.)

The State habeas court found as follows on this claim:

> After reviewing the matter, I find that the purpose was acceptable under 404(b), that the evidence was not overly prejudicial and that the evidence, though disputed, was sufficiently convincing.  I would also note that the jury was instructed as to the purpose of the evidence.

(# 18, Ex. 5 at 7-8).

The trial court's ruling on the admission of evidence under the state evidentiary rule is a question of state law that is

binding on this federal court.  Thus, the question before this court is simply whether the admission of such evidence was fundamentally unfair or a miscarriage of justice.

The undersigned has reviewed the testimony from the _in camera_ hearing, as well as the testimony of the same witnesses in front of the jury at Petitioner's trial.  The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the admission of evidence concerning other bad acts under Rule 404(b) of the West Virginia Rules of Evidence was fundamentally unfair or a miscarriage of justice and, thus, Petitioner has not demonstrated a violation of his right to due process cognizable in federal habeas corpus.  The undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Three of Petitioner's section 2254 petition.

**E.  Ground Four - Admission of prior inconsistent statements.**

In Ground Four of his section 2254 petition, Petitioner asserts that the State made its case by bringing in prior inconsistent statements, ostensibly to impeach its own witnesses, but that the prior statements were offered for the truth of the matter asserted.  In section "VI" of his circuit court habeas petition, Petitioner addressed this claim as follows:

41

> Your Petitioner, Brandon Blackmon, was denied his
> right to a fair trial in this matter because THE STATE
> WAS ALLOWED DURING THE TRIAL TO CONSISTENTLY OFFER INTO
> EVIDENCE THE PRIOR INCONSISTENT STATEMENTS OF WITNESSES
> AS PROOF OF THE TRUTH OF THE MATTER ASSERTED.  The Court
> in this matter consistently permitted the use of
> inconsistent statements as substantive evidence.  The
> Court consistently permitted out of Court inconsistent
> statements by witnesses to be used as the testimony of
> the witnesses during trial.

(# 2-2 at 72, Appx. D at 15).  Petitioner's habeas appeal petition

adds that "the introduction of these prior inconsistent statements

as substantive evidence denied Petitioner a fair trial as the prior

inconsistent statements were offered for the truth of the matter

asserted and, thus, reduced or eliminated a proper cross-

examination of the deponent by trial counsel."  (# 2-2 at 28-29,

Appx. B at 24-25).

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment addresses this claim as follows:

> The habeas court found in pertinent part that
> because the State's witnesses were "suspect" as a result
> of their criminal histories and backgrounds and because
> of the criminal activity they engaged in during the
> events relevant to the crime, the State was entitled to
> rely on their initial statements given to police.  The
> habeas court held that because such witnesses are prone
> to altering their stories, they are an exception to the
> rules against hearsay.  The habeas court concluded that
> "Upon review, this Court finds that [the State's] actions
> were not a subtrafuge [sic; subterfuge], but were a means
> of dealing with a series of difficult witnesses. (Resp't
> Ex. 5 at 9).

(# 19 at 29).  Respondent further argues:

> The findings of the habeas court were made in light
> of state law only.  However, unless Petitioner can cite
> to controlling federal precedent that controverts the

42

findings of the habeas court, the presumption is they are
correct as a matter of federal law.  Petitioner has made
no such showing and no such argument.  Petitioner has not
cited to any evidence introduced at trial that violated
due process.  Rather, Petitioner challenges the testimony
of the witnesses and the admissions of their statements
to police under state court rules of evidence and this is
insufficient to form the basis for relief in federal
habeas corpus.  This claim fails for that reason alone.

(Id. at 29-30).

However, Respondent further argues that Petitioner cannot

demonstrate a violation of his due process rights.  Respondent

states:

> The statements given to police by the witnesses were
> signed by the declarants.  The authenticity and
> reliability of the statements were never at issue.  The
> witnesses did not dispute that they had given and signed
> the statements to police.
>
> Nearly every player in the crime and most of the
> witnesses besides the employees of Shoney's and Rich Oil
> were fringe characters at best and criminals at worst.
> They were almost surely unwilling participants in the
> justice system at which they lived outside.  Because the
> State faced the potential for their own witnesses to be
> hostile, the prosecutor was required to rely on their
> initial statements to police, given before they were able
> to concoct stories among themselves.  Moreover, trial
> counsel did not object to the admission of the
> statements.  This would constitute waiver and prohibit
> relief on this claim. [Citation omitted].  Although this
> claim was raised on appeal, trial counsel's failure to
> object to the admission of the statements would have
> constituted waiver and precluded review or relief.

(Id. at 30).  Respondent then argues that the claim is procedurally

defaulted.  The undersigned finds this argument to be inapposite,

as Petitioner raised this claim in both his direct appeal and his

state court habeas petitions, and there is no ruling from the state

courts that the claim was waived or defaulted.

Finally, Respondent asserts that Petitioner's due process claim must fail.  Respondent argues:

> Because the statements were the truth, born out by other testimony, signed by the declarants, it cannot be said the admissions thereof rendered the trial fundamentally unfair as required to demonstrate a violation of due process.  Moreover, because the declarants testified, there was no violation fo the Confrontation Clause flowing from the admission of hearsay statements.  See Crawford v. Washington, 541 U.S. 36 (2004) (In Crawford, the Supreme Court held that the Confrontation Clause gives criminal defendants the right to confront witnesses who make testimonial statements at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination but only if the statements were not introduced for the truth of the matter asserted.) (Id. at 53-54, 59 n. [9]).  Any error in the admission of the statements was harmless.  Brecht, supra.
>
> Without a showing that the admission of truthful statements from declarants who testified renders a trial fundamentally unfair, this claim fails.

(Id. at 32).

Petitioner's Response to the Motion for Summary Judgment argues as follows on this claim:

> In supplying an area of genuine disagreement and contention of material issues and fact, Petitioner proffers [sic; proffers] that the State had obtained "so-called" non-sworn statements from approximately twenty-five (25) witnesses.  Once the witnesses were actually sworn under oath and presented a different story (the Truth), the State severely prejudiced Petitioner in front of the jury by offering the prior "unsworn" statements as impeachment material.  The State is responsible for its witnesses and their testimony.
>
> Specifically, six (6) crucial witnesses this was done to was Shahrekia Brown, Shahtekia Brown, Xzambria Bryant, Brian Knox, Phillip Workman, and Willie West.

44

Between these six (6) witnesses, there were seventeen
(17) different statements. (Shahrekia Brown 2; Shahtekia
Brown 4; Xzambria Bryant 4; Brian Knox 2; Phillip Workman
3; Willie West 2)

After the State saw and heard its witnesses begin to
testify differently, the State attempted to "refresh
their memory" by forcing them to read their own prior
statements; not one coincided with prior statements
obtained by the State.  See Exhibit 3 / Statements of:
Shahrekia Brown; Shahtekia Brown; Xzambria Bryant; Brian
Knox; Phillip Wayne Workman; Willie James West, Jr.  (The
State refused to let each witness read every statement
they had given, just the one that fit the State's
motive.)

Importantly, the State's witnesses, under oath, kept
testifying, quote "This is not what I said; I didn't say
that to you," referring to what the police wrote in their
statements.

(# 23 at 15-16)(emphasis in original).  Petitioner notes that

nearly every witness the State called admitted to being heavily

intoxicated and on drugs at the time the State Police took their

statements, and at the time of the events about which they were

giving statements.  (Id. at 16).

The State habeas court made the following findings concerning

this claim:

a.   Prosecutor Abraham had to use prior statements of
     most of the witnesses "allied" with the Defendant
     to place the Defendant with certain people at
     certain times.  On many occasions, these witnesses
     tried to alter their prior statements in their
     trial testimony. *Sherekia Brown - Trial Transcript
     - Day 3 - Pages 38-39; Shatekia Brown - Trial
     Transcript - Day 3 - Page 92.*

b.   The Petitioner asserts that the State used evidence
     of prior inconsistent statements in an improper
     manner.  Prosecution of cases involving drug
     transactions and cases having a relation to these

45

transactions often means using witnesses who are involved in criminal activity, or are on the fringes of criminal activity. <u>State v. Ropa</u>, 311 S.E.2d 412 ([W. Va.] 1983). It is standard police procedure to interview witnesses quickly and, generally, individually to minimize the opportunity to confer with others about what occurred and perhaps change their story to minimize the witnesses involvement or to help an associate. *Sgt. White - Trial Transcript - Day 4 - Page 194.*

 c. Much of the case consists of testimony of individuals who are somewhat "suspect," but who know what happened with respect to the Linville death. My examination of the impeachment supports the position that testimony has been altered to help Mr. Blackmon or to minimize involvement in drug activity. It was therefore appropriate for Mr. Abraham to impeach the witnesses he was forced to call and was not a subtrafuge [sic; subterfuge] to get inadmissible hearsay to the jury. Justice Cleckley discusses this at great length in his <u>Handbook on Evidence</u> at § 6-7(g).

 d. Upon review, this Court finds that Mr. Abraham's actions were not a subtrafuge [sic; subterfuge], but were a means of dealing with a series of difficult witnesses.

(# 18, Ex. 5 at 8-9).

Upon a review of the entire record, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the use of prior inconsistent statements of the State's witnesses to impeach their trial testimony was fundamentally unfair or a miscarriage of justice and, thus, Petitioner has not demonstrated a violation of his right to due process cognizable in federal habeas corpus. Nor has Petitioner demonstrated a violation of any other federal constitutional rights. The undersigned further proposes that the presiding

46

District Judge **FIND** that the state habeas courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Four of Petitioner's section 2254 petition.

**F.   Ground Five - Denial of motion for mistrial after witnesses mentioned lie detector tests.**

In Ground Five of his section 2254 petition, Petitioner asserts that the trial court erred by denying Petitioner's motion for a mistrial after two State witnesses testified regarding lie detector testing.  Petitioner addressed this claim in section "VII" of his amended circuit court habeas petition as follows:

> Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because THE COURT DENIED YOUR PETITIONER'S MOTION FOR MISTRIAL AFTER TWO STATE WITNESSES TESTIFIED REGARDING LIE DETECTOR TESTING.  Two State witnesses at trial testified that they had been subjected to lie detector testing.  State witnesses Brandon Beverly testified "They put us on a lie detector and everything."  Furthermore, witness Dan Griffey mentioned the taking of a lie detector test.

(# 2-2 at 72-73, Appx. D at 15-16).  Petitioner's habeas appeal petition adds:

> It is reasonable to assume that when the jury heard the direct testimony of Brandon Beverly that he had undergone a lie detector test they assumed the results were favorable.  The presumption that would go with this knowledge had already formed by the time the Judge gave an instruction for them to ignore it.  The State's failure to thoroughly investigate and address the possible connection between the drug transfers in which these people took part and the death of Larry Linville increases the significance of the probable effect of the testimony on the jury.

47

(# 2-2 at 30, Appx. B at 26).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment addresses this claim as follows:

> In ground five, Petitioner argues that the trial court erred by denying the defense's motion for a mistrial after two State's witnesses testified about passing a polygraph test. The habeas court found that the challenged testimony was harmless and cured by an instruction directing [the jury] to disregard the same. (Resp't Ex. 5 at 9.)

> It has been held that the decision by a trial court whether to declare a mistrial is a fact specific analysis subject to wide latitude from reviewing courts:

> > Whether the declaration of a mistrial is manifestly necessary *turns on the facts before the trial court*. See <u>Illinois v. Somerville</u>, 410 U.S. 458, 464, 93 S. Ct. 1066, 35 L. Ed.2d 425 (1973) . . .

> > In all cases, the determination of a trial court that a mistrial is manifestly necessary is entitled to *great deference*. See <u>id.</u> at 510, 98 S. Ct. 824.

<u>Saunders v. Easley</u>, 230 F.3d 679, 685 (4th Cir. 2000)(emphasis added).

> During the questioning of two State's witnesses, both commented, unsolicited, that they had been released from questioning after taking a lie detector test. During the testimony of Danny Ray Giffey, who was in the car with Linville that night, he stated:

> > THE STATE:      You stayed in Logan at the state police detachment until later that night?

> > [GRIFFEY]:      Yes. Took a lie detector test.

(Resp't Ex. 8 at 178.)

Trial counsel did not object.

48

During the testimony of Brandon Beverly, when being questioned about his statements to police, he said, "I know they put us on a lie detector test and everything." (Id. at 191.)  Trial counsel asked to approach the bench and made a motion for a mistrial.  The court denied the motion and instructed the jury:

> Ladies and gentlemen, Mr. Beverly made mention of a polygraph lie detector.  You are instructed to disregard any consideration of that and wipe it from your memories.  It's not to play any part in your consideration of [t]his case or your deliberations.

(Id. at 194.)

The statements of the witnesses in this regard is inconsequential. Their credibility was never challenged. The testimony of the witnesses was not a linchpin of the State's case nor was their credibility a significant factor.  They were not suspects and their version of events [was] corroborated by other witnesses and the video evidence from Rich Oil.  There is nothing to suggest the remarks were prejudicial or significant to the jury's verdict.  Therefore, neither the statements of the witnesses nor the ruling of the trial court rendered the trial fundamentally unfair as required to show a due process violation flowing from a trial court ruling. Brecht, supra.

Petitioner has not cited to any controlling federal precedent that would render the conclusions of the habeas court wrong as a matter of federal law.

(# 19 at 32-34).

Petitioner's Response to the Motion for Summary Judgment

states:

> Prior to trial, Petitioner filed a motion to the Court barring the mentioning of Polygraph Test.  The Court granted the motion, and the State agreed to it and stated that it would inform all its witnesses of the Court's decision. See Exhibit 4/Day 1/Page 94/Lines 8-24.

> Petitioner's argument is that the mentioning of
> Polygraph Testing by two (2) of the State's witnesses
> unduly influenced the Petit jury to not only accept their
> testimony to be true, but also other witnesses called to
> the stand.  In doing so, this prejudicial act gave other
> testimony "greater weight " than it should have under the
> assumption they too took and passed it.

(# 23 at 18).

The State habeas court made the following findings on this

claim:

> a.  With respect to Petitioner's assertion that his
>     trial was unfair because of the mentioning of "lie
>     detector" testing, I would note, as did the State,
>     that this was not solicited by the Prosecuting
>     Attorney.  I would further note that nothing was
>     said about the results of any testing or about any
>     refusal to take the test.
>
> b.  The mention of lie detector testing is not a "bomb"
>     that invalidates testimony, but something that must
>     be considered with a determination made as to
>     whether it [a]ffected the trial improperly.  State
>     v. Chambers, 459 S.E.2d 112.
>
> c.  In addition to the relatively harmless nature of
>     the testimony, I note that instructions to
>     disregard the testimony were given to the jury in
>     accordance with State v. Chambers, 459 S.E.2d 112.

(# 18, Ex. 5 at 9).

Admission of polygraph test results is generally inadmissible

under the West Virginia Rules of Evidence because they have not

been proven to be reliable as scientific evidence.  State v. Beard,

461 S.E.2d 486 (W. Va. 1995).  In a hearing at the beginning of

Petitioner's trial, outside the presence of the jury, the defense

moved in limine to exclude or suppress the results of polygraph

testing of various witnesses in Petitioner's case.  The discussion

of this motion before the court took place as follows:

MS. MORAN:        There's a Motion in Limine to suppress
                  the results of polygraph, which I imagine
                  you will agree to.   The only reason I
                  brought it up is there were so many
                  polygraphs taken in this case, I wanted
                  to get an order from the court that the
                  witnesses would be instructed that they
                  are not to make any reference to the
                  polygraph.

MR. ABRAHAM:      I have no objections to that.   Obviously,
                  that's not admissible.   We have done our
                  best to -- those witnesses I've had any
                  contact with, which at this point has
                  been very few, - - we've instructed them
                  not to mention those things.

THE COURT:        Okay.

MR. ABRAHAM:      And we will do our best tomorrow to further
                  instruct any witnesses that will be called not
                  to make any mention of that.

THE COURT:        Okay.

(# 18, Ex. 7 at 94).

The two witnesses who mentioned that they were given lie
detector tests did not mention the results thereof.   These
witnesses were the travel companions and friends of the victim.
Based upon the evidence presented to the jury, there was no reason
to question their credibility.   Furthermore, the court properly
instructed the jury to disregard the mention of the lie detector
testing.   Petitioner has not rebutted the circuit court's finding
that the mention of polygraph testing was harmless.

The undersigned proposes that the presiding District Judge
**FIND** that Petitioner has not demonstrated that the mentioning of

51

polygraph testing by two of the State's witnesses was fundamentally unfair or a miscarriage of justice and, thus, Petitioner has not demonstrated a violation of his right to due process cognizable in federal habeas corpus.  The undersigned further proposes that the presiding District Judge **FIND** that the state habeas courts' rulings denying habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly-established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Five of Petitioner's section 2254 petition.

### G.   Ground Six - Admission of still photographs from surveillance tapes.

In Ground Six of his section 2254 petition, Petitioner contends that the trial court erred when it admitted into evidence still photographs made from surveillance tapes without adequate foundation for their admission.  Petitioner addressed this claim in section "VIII" of his amended circuit court habeas petition as follows:

> Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because THE COURT PERMITTED EVIDENCE OF STILL PHOTOS FROM SURVEILLANCE TAPES WITHOUT ADEQUATE FOUNDATION FOR THEIR ADMISSION. The State provided no witness that could testify that the figure shown in the still photos taken from the videotape was a fair and accurate representation of the young man who stood at the Super America counter at 5:19 a.m. on December 17, 2000.

(# 2-2 at 73, Appx. B at 16).  Petitioner's habeas appeal petition further states:

The State introduced still photos taken from a video surveillance tape automatically recorded in a SuperAmerica store near the home of Xzambria Bryant. It was introduced, the State argued, to show that Brandon Blackmon was in that store on December 17, 2000, at 5:19 a.m. The tape revealed a young African American man at the store counter. The time recorded on the tape was 5:19 a.m.

The witness used to introduce the tape was the manager of the store who was responsible for maintenance of the machine. He testified that he was not present in the store at 5:19 a.m. on December 17, 2000, and could not confirm the tape gave a fair and accurate representation of the figure reflected on the tape at the time it was allegedly recorded. The Petitioner objected to its admission on the grounds that the State had not provided a sufficient foundation for introduction of this critical piece of information. The State failed to produce the Clerk who had been on duty the night the recording was made. The Court overruled Petitioner's objection and placed the still photos in evidence.

* * *

In the case now before the Court, over the vigorous objection of the Petitioner this tape and still photos taken from the tape, were entered into evidence to show that at 5:19 a.m. on December 17th, Brandon Blackmon was in the immediate vicinity of the party attended by Willie West, a party the State repeatedly reminded the jury, where excessive amounts of drugs and alcohol were consumed by those by those in attendance. The State used it in an attempt to bolster the inconsistent and erratic testimony of the partygoers through whom the State attempted to establish Brandon Blackmon's arrival at the party, and the time at which he arrived.

(# 2-2 at 30-32, Appx. B at 26-28).

Respondent's Memorandum in support of his Motion for Summary Judgment addresses this claim as follows:

In claim six, Petitioner challenges the admission of videotape evidence introduced at trial. Specifically, Petitioner challenges the admission of still photographs taken from a video surveillance camera of him at a

53

convenience store close to the home of Xzambria Bryant in the hours prior to the crime.

* * *

Again, Petitioner's entire argument consists of challenging the admission of evidence under state law without showing how the evidence rendered the trial fundamentally unfair. As with the other similar claims, this ground fails to raise a federal issue. The issue for this Court is not whether the evidence was admitted without a proper foundation under state law but whether its admission was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." <u>Payne v. Tennessee</u>, 501 U.S. 808, 825 (1991).

The evidence Petitioner challenges herein consisted of photographs of him at a convenience store in the early morning hours of December 17, introduced for the purpose of showing him in the vicinity of Xzambria Bryant in the hours before the murder. (Resp't Ex. 10 at 215-28.) Trial counsel objected on the grounds that the witnesses who vouched for the photographs was not qualified to lay a foundation for their admission under state law. Trial counsel did not challenge the validity of the photographs nor their authenticity. It was left to the jury to make a fact determination about whether or not it was Petitioner in the photographs. The challenged witnesses did not offer an opinion on whether or not it was Petitioner in the photographs. Rather, the witness only substantiated the source of the photographs.

Without an argument showing that the admission of the challenged evidence rendered the trial fundamentally unfair, this claim fails to raise a federal issue, whether the evidence was erroneously admitted or not.

Therefore, Petitioner has not argued how the ruling of the habeas court runs contrary to applicable federal authority.

(# 19 at 34-35).

Petitioner's Response to the Motion for Summary Judgment asserts:

Despite the fact that there was no testimony from any State witnesses who positively identified Petitioner in any of the photograph(s), the trial Court entered the Photograph(s) into evidence.   The only identification concerning the photograph(s) was that it was the inside of a store, nothing more.   *See Exhibit 4/Day 3/State Witness Dwayne Stollings/Page 222-223; 223-226/Lines 23-4; 9-9; Day 4/State Witness Chrystal Fuller/Page 31/Lines 2-7.*

The trial Court, by permitting the photograph(s) to be taken into the Jury room severely prejudiced Petitioner irreparably. Further, the State intentionally mislead the Jury and misstated pertinent trial testimony when, during closing argument, said ". . . It is possible that there could have been another black male dressed as Chrystal Fuller said and said that one kind of looks like Brandon on the tape . . . ."

(# 23 at 13).

Petitioner asserted that he had an alibi for the time period in which the crime could have occurred.  Petitioner claimed that he and his girlfriend Chrystal Fuller were in West Logan the entire night of December 16-17, 2000.  The State called Dwayne Stollings, the manager of a Super America convenience store that was in the vicinity of Xzambria Bryant's apartment[3] to testify about still photographs made from the video surveillance tapes from his store, which the State purported to show that Petitioner was at the Super America near Ms. Bryant's apartment in Logan County at 5:19 a.m. on December 17, 2000, approximately two hours before the murder.  Mr. Stallings was not working on the night in question and, thus, could

---

[3]   The undersigned notes that this convenience store is different that the Rich Oil Station, which is where Petitioner and Willie West allegedly encountered the victim, Larry Linville on the morning of December 17, 2000.

not identify Petitioner as the person in the photographs; however,
he was able to establish that the photographs came from the video
surveillance system at his store based upon his knowledge of how
the store appeared, and the fact that the store number is
identified on the photographs, along with the date and time.

The State habeas court found as follows on this claim:

a. The record of this case, particularly, the
testimony of store manager Dwayne Stollings,
provides adequate foundation for the gas station
video surveilance [sic; surveillance] tape and
still pictures made from it. *Trial Transcript -
Day 3 - Pages 215-217.* The undersigned judge
simply agrees with the assertion of the State that
it was up to the jury to determine the identity of
the customer.

(# 18, Ex. 5 at 9).

The undersigned proposes that the presiding District Judge
**FIND** that Petitioner has not demonstrated that the admission of the
testimony by Dwayne Stollings concerning the still photographs made
from the surveillance video from the convenience store where he was
a manager, which the State purported to depict Petitioner shopping
there at 5:19 a.m., on December 17, 2000, was fundamentally unfair
or a miscarriage of justice and, thus, Petitioner has not
demonstrated a violation of his right to due process cognizable in
federal habeas corpus. The undersigned further proposes that the
presiding District Judge **FIND** that the state habeas courts' rulings
denying habeas corpus relief on this claim were neither contrary
to, nor an unreasonable application of, clearly-established federal

56

law, and that Respondent is entitled to judgment as a matter of law on Ground Six of Petitioner's section 2254 petition.

**H.    Ground Seven - Refusal to allow admission of co-defendant's psychiatric records.**

In Ground Seven of his section 2254 petition, Petitioner asserts that the trial court erred by refusing to allow Petitioner to introduce psychological and psychiatric records concerning Willie West's mental health.  Petitioner addressed this claim in section "X" of his amended circuit court habeas petition as follows:

> Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because THE COURT REFUSED TO ALLOW YOUR PETITIONER TO INTRODUCE PSYCHOLOGICAL AND PSYCHIATRIC EVIDENCE OF THE MENTAL INSTABILITY OF THE STATE'S CHIEF WITNESS.  The only direct evidence in this case involved the testimony of the co-defendant, Willie West.  The testimony of Willie West alleged that he and Brandon Blackmon participated in the killing of Larry Linville.  However, despite the fact that Willie West was the only witness who could place your Petitioner at the scene of the crime and was the only witness who could testify that your Petitioner allegedly participated in the murder, the Court still refused to allow your Petitioner to introduce psychiatric and psychological records of Willie West's history of drug dependency and violent behavior.  The records further indicated a Mental Hygiene Petition within two months of the crime to which he confessed.

(# 2-2 at 73-74, Appx. D at 16-17).  Petitioner's habeas appeal petition further addresses this claim as follows:

> The State, lacking any physical evidence that Petitioner Brandon Blackmon participated in the crime described by State witness Willie West and any testimonial evidence that would place Petitioner at or near the scene of West's crime, other than the testimony of West was totally dependent on the testimony of Willie

West that Brandon Blackmon was his accomplice in the crime for which West pled guilty.

* * *

The bias of Willie West, the inconsistency of his prior statements with his trial testimony; the inconsistency of his testimony with the testimony presented by the other witnesses and the incredibility of the story he told were confusing to the jury and highly prejudicial to the Petitioner. They were not evidence that a reasonable jury member could rely upon in reaching their decision. The Court erred in denying the Petitioner an opportunity to present evidence that was relevant to the degree of credibility the jury should have afforded Willie West.

(# 2-2 at 33-35, Appx. B at 29-31).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts:

The psychiatric records referred to by Petitioner were records of an involuntary commitment of William West to a psychiatric facility for drug and alcohol abuse and depression. (Resp't Ex. 7 at 95-99.) Trial counsel filed a motion in limine to introduce evidence of William West's psychiatric history for the purpose of challenging his credibility. (Id. at 95). The trial court ruled that West's mental health records were irrelevant because West received treatment for substance abuse and not a psychiatric disturbance that raised issues about his credibility. (Resp't Ex. 8 at 3-4.)

As the trial court noted, West's mental health records were related to his substance abuse. Evidence was brought out at trial all the principles were drug and alcohol abusers. West never denied that he was using controlled substances on the night of the crimes. What possible affect the challenged evidence could have had on the outcome of the trial is not apparent from the record or from Petitioner's argument.

This claim fails to raise a federal issue and fails to demonstrate that controlling federal precedent was misapplied by the habeas court in arriving at its conclusion on this ground.

58

(# 19 at 36).

Petitioner's Response to the Motion for Summary Judgment
contends:

The trial Court erred in not allowing Petitioner to
introduce mental health records of Willie James West Jr.
to be brought into evidence.   Through these records
Petitioner would have been able to impeach his
credibility and show his state of mind.   *See Exhibit
4/Day 1/Pages 95-99; 104-105; 114-127/Lines 1-18; 8-11;
6-6: Day 2/Pages 3-5/Lines 3-3.*

In those records he has stated, "They'll never take
me alive," referring to Law Enforcement and, "I'll use as
much as I can get," referring to narcotics.   He was
diagnosed as being suicidal and suffering from severe
depression.   Other witnesses stated he was
acting/behaving "abnormal" the day of his crime.   This
was the only fact they all, on a consistent basis, agreed
upon.   *See Exhibit 3/Shahtekia Brown 2nd Statement.*
Importantly, this is the person who confessed to the
crime.

If the professionals at "Logan, Mingo and Health"
(Psychiatric Hospital), would have felt what he was
saying wasn't true, they would never have written it in
their reports and prescribed the medication they did,
which he was not taking.

He was diagnosed as being suicidal and suffering
from severe depression, as previously stated.   Taking
into consideration the remarks he made regarding
narcotics and his testimony of being on drugs mere hours
before the crime happened, it is not inconceivable that
his confession was not the truth.   The information in his
mental health records were/are very crucial regarding his
truthfulness and his state of mind while on them.   He
claimed that he was at a "party" from 9 p.m. Saturday,
the 16th, until the incident occurred on Sunday, the
17th, using heavy amounts of drugs and alcohol the whole
entire time.   That is approximately ten (10) to eleven
(11) hours according to the Police Report.

Going to his frame of mind, when you couple together
his lack of sleep, no identifiable motive, tendency
toward instability, tendency toward suicidal depression,

and his admitted dependency on drugs (all this added
together), along with his pleading guilty and admitting
to shooting the victim with no provocation whatsoever,
this should have warranted the admissibility of these
records.

(# 23 at 20-21).

The State habeas court made the following findings concerning
this claim:

> a.   During trial proceedings the court addressed
> certain mental health records of Mr. West which the
> defense desired to use for impeachment purposes.
> The records which consisted of a mental hygiene
> filing without a certification were reviewed,
> discussed with counsel and excluded as not relevant
> to Mr. West's credibility.   No foundation was
> presented of a mental health issue potentially
> affecting Mr. West's credibility.   Professor
> Cleckley thoroughly discusses this in his evidence
> book at § 6-10-(B).   His position on the issue is
> supportive of the ruling made in this case.

(# 18, Ex. 5 at 10).

The undersigned proposes that the presiding District Judge
**FIND** that Petitioner has not demonstrated that the refusal to allow
the admission of Mr. West's mental health records to challenge the
credibility of his trial testimony was fundamentally unfair or a
miscarriage of justice and, thus, Petitioner has not demonstrated
a violation of his right to due process cognizable in federal
habeas corpus.  The undersigned further proposes that the presiding
District Judge **FIND** that the state habeas courts' rulings denying
habeas corpus relief on this claim were neither contrary to, nor an
unreasonable application of, clearly-established federal law, and
that Respondent is entitled to judgment as a matter of law on

Ground Seven of Petitioner's section 2254 petition.

> **I.   Ground Eight - Denial of a speedy trial.**

In Ground Eight of his section 2254 petition, Petitioner asserts that he was denied a speedy trial.  Petitioner addressed this claim in section "II" of his amended circuit court habeas petition as follows:

> Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because of his DENIAL OF A RIGHT TO A SPEEDY TRIAL.  Your Petitioner was indicted by the May 2001 term of the Logan County Grand Jury for Murder.   Four terms of Court passed before your Petitioner was tried by the September Term of the 2002 Petit Jury.  Furthermore, by Statute, your Petitioner had an absolute right to be tried during the term in which he was indicted.

(# 2-2 at 70, Appx. D at 13).  Although raised in his habeas appeal petition, Petitioner did not really elaborate on this claim therein.  (# 2-2 at 35, Appx. B at 31).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment notes that Petitioner's asserts that, under West Virginia Code § 62-3-21, a prisoner must be tried within four terms of the grand jury following indictment.  Respondent further notes that section 62-3-21 actually requires that a prisoner be tried within three terms of the grand jury, not four.  Respondent further asserts, however, that this state statute is irrelevant in the context of a speedy trial claim raised in federal habeas corpus. (# 19 at 36 n.10).

Respondent's Memorandum of Law further states:

After setting forth the time frame of the trial and pre-trial proceedings and noting that the continuances granted on the case were agreed to by both the State and trial counsel, the habeas court concluded in pertinent part: "There is no support in the record for the ascertion [sic; assertion] that Mr. Blackmun [sic; Blackmon] was denied his right to a speedy trial." (Resp't Ex. 5 at 6.)

This claim is insufficiently pled and fails to raise a federal issue in that it is premised on West Virginia's four term rule which is a matter of state law and not a speedy trial issue within federal habeas corpus. [Footnote omitted].  In order to present a speedy trial issue in the context of federal habeas corpus, Petitioner must demonstrate that his trial was rendered unfair and a violation of due process because of a delay in bringing him to trial.

> A claim that the state has violated this constitutional guarantee is a fact-intensive inquiry requiring the balancing of (1) "whether [the] delay before trial was uncommonly long," (2) "whether the government or the criminal defendant is more to blame for that delay," (3) "whether in due course, the defendant asserted his right to a speedy trial," and (4) "whether he suffered prejudice as the delay's result." Doggett v. United States, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed.2d 520 (1992) (citing Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed.2d 101 (1972)).

Wilson v. Mitchell, 250 F.3d 388, [404] (6th Cir. 2001).

Petitioner fails to argue or demonstrate how his trial was prejudiced by a delay in the proceedings, particularly in light of the continuances granted by the trial court and agreed to by the parties. (Resp't Ex. 5 at 6.)  Moreover, trial counsel's agreement to the continuances, as noted by the habeas court, would constitute waiver of this claim as a matter of law. (See Respondent's argument, ground four).

This claim fails to raise a federal issue or to demonstrate that the findings of the habeas court were a misapplication of controlling federal precedent.

(# 19 at 36-38).

Petitioner's Response to the Motion for Summary Judgment did not address this claim for relief.  (# 23).

The State habeas court made the following findings concerning this claim:

> a.   There is no support in the record for the ascertion [sic; assertion] that Mr. Blackmun [sic; Blackmon] was denied his right to a speedy trial.   The indictment in this case occurred on May 18, 2001. A continuance was granted three times which reset the trial to the following dates: August 23, 2001, December 19, 2001, and April 11, 2002.  (the order on this continuance is in error in that it states April 1, 2001 as the new trial date).  Finally, the trial in this case was continued again at a July 31, 2002 hearing by agreement of all counsel where the trial was scheduled for October 8, 2002 when the trial was, in fact, held.

> b.   I would find that the recitation of the respondant [sic; respondent] to the petition is correct and that there was no speedy trial violation.  I would further note this was not asserted as an appeal ground by attorney Jane Moran in her appeal to the West Virginia Supreme Court that was refused.

(# 18, Ex. 5 at 6).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated any actual prejudice from the delay in his trial and, thus, he has not demonstrated a denial of his due process rights.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' decisions denying habeas corpus relief were contrary to, or an unreasonable application of, clearly established federal law, and that Respondent is entitled to

judgment as a matter of law on Ground Eight of Petitioner's section 2254 petition.

**J.   Ground Nine - Ineffective assistance of counsel claims.**

In Ground Nine of his federal petition, Petitioner asserts that his counsel in his criminal proceedings rendered ineffective assistance to him in violation of his Sixth Amendment rights. Petitioner alleges five (5) claims of ineffective assistance of counsel in his section 2254 petition which were also raised in his state habeas corpus proceedings.  They are as follows:

1.   Failed to file a Motion for Change of Venue;

2.   Failed to investigate and/or employ any agency to interview the public at random to determine the effect of pre-trial publicity;

3.   Failed to prepare and submit the necessary voir dire questions regarding pre-trial publicity;

4.   Failed to request individual voir dire; and

5.   Failed to challenge the composition of the grand jury or its procedure.

(# 2-2 at 70-71, Appx. D at 13-14).

However, in Petitioner's section 2254 petition, Petitioner also attempts to raise for the first time in his habeas corpus proceedings an additional claim of ineffective assistance of counsel, asserting that his counsel failed to investigate other leads and suspects, and other evidence allegedly overlooked by the State.  Furthermore, Petitioner's Response to the Respondent's Motion for Summary Judgment almost exclusively addresses this

additional claim.  (# 23).

Petitioner did not address this claim in either his direct appeal (the undersigned notes, however, that claims of ineffective assistance of counsel are generally reviewed in habeas corpus and not on direct appeal).  Nor did Petitioner raise this specific claim of ineffective assistance of counsel in his circuit court habeas corpus petition or the appeal therefrom.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that this specific claim of ineffective assistance of counsel, alleging that Petitioner's counsel failed to investigate other leads, suspects and evidence overlooked by the State, is unexhausted, and is not reviewable by this federal court.

Turning to Petitioner's exhausted claims of ineffective assistance of counsel, four of the five concern issues of pre-trial publicity and its effect on jury selection.  Petitioner addressed these claims in sections "I" and "III" of his amended circuit court habeas petition.  Those sections state as follows:

I.

Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because of highly PREJUDICIAL PRETRIAL PUBLICITY.  From the time of your Petitioner's arrest on December 22, 2000, until the start of Petitioner's trial on October 8, 2002, the local news media, including the county's only newspaper, The Logan Banner, published stories which were highly prejudicial to your Petitioner.  Furthermore, although questions about pre-trial publicity were submitted and asked to prospective jurors, there was never a Motion for Change of Venue in this matter.  It should be noted that this case involved the death of a Caucasian male by an African

American male.  Further, Logan County has an African American population of less than five percent.  There was no evidence to indicate that either Counsel for the Petitioner ever performed or requested any studies to indicate whether Petitioner could receive a fair trial.

* * *

III.

Your Petitioner, Brandon Blackmon, was denied his right to a fair trial in this matter because of INEFFECTIVE ASSISTANCE OF COUNSEL.  It should be noted that at trial, your Petitioner had the benefit of two lawyers for the Defense, namely C. Jane Moran and Geoffrey Ifeanyi Ekenasi.  It is undisputed that C. Jane Moran has vast experience in criminal law and practiced criminal law for more than twenty years.  However, it should also be noted that both of Petitioner's attorneys failed to perform the following:

A.    Failed to file a Motion for Change of Venue; and

B.    Failed to investigate and/or employ any agency to interview the public at random to determine the effect of pre-trial publicity; and

C.    Failed to prepare and submit the necessary voir dire questions regarding pre-trial publicity; and

D.    Failed to request individual voir dire; and

E.    Failed to challenge the composition of the grand jury or its procedure.

(# 2-2 at 70-71, Appx. D at 13-14).  Petitioner does not go into any further detail concerning any of these claims in either his amended circuit court habeas petition or in his habeas appeal petition.  (Id.; # 2-2 at 35, Appx. B at 31).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment first sets forth the state habeas court's ruling on the ineffective assistance of counsel claims raised by

Petitioner.  Respondent asserts that the ruling states in pertinent part:

> The portion of the petition alleging ineffective assistance of counsel is largely based on the failure of trial counsel to move for a change of venue.  It is not contested that their [sic; there] was no mention [sic; motion?] made, however, there is no evidence that the failure to make the motion was in any way deficient under any standard of reasonableness, such as that set forth in State v. Miller, 459 S.E.2d 114 ([W. Va.] 1995).

(# 18, Ex. 5 at 5).  Respondent then addresses the United States Supreme Court's articulated standard for determining whether counsel has provided ineffective assistance which, the undersigned notes, is the same standard used by the Supreme Court of Appeals of West Virginia in Miller.  (# 19 at 38-39).

In Strickland v. Washington, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." Holman v. Gilmore, 126 F.3d  876, 881 (7th Cir. 1997). Respondent's Memorandum of Law adds, " [a] Petitioner may not merely speculate about potential prejudice but must 'affirmatively

67

prove' that the result of the proceedings would have been different but for the deficient performance of trial counsel." <u>Strickland</u>, 466 U.S. at 693.  (# 19 at 39).

Respondent's Memorandum of Law further states:

Petitioner has neither argued nor demonstrated how his trial was rendered unfair by ineffective assistance of counsel other than to list alleged failures of trial counsel without arguing either deficiency or resulting prejudice.

There is no indication from the record that it was either unreasonable or prejudicial for trial counsel not to pursue issues regarding pre-trial publicity. Moreover, the trial court questioned each juror about prior knowledge of the case during voir dire.  No juror was seated who stated that he or she was influenced by prior knowledge of the case and Petitioner has not argued otherwise.

This claim fails to argue or demonstrate how trial counsel's actions or inactions resulted in an unfair trial.  Therefore, Petitioner has not rebutted the presumption that the habeas court's findings were correct as a matter of federal law on this issue.

(<u>Id.</u>)

As previously noted herein, Petitioner's Response to the Motion for Summary Judgment focuses exclusively on his claim that his trial counsel failed to properly investigate other leads, suspects and evidence, and to prepare a proper defense, which is unexhausted and not reviewable by this court.  Therefore, the undersigned will not further address the Response.

The State habeas court's ruling in its entirety states:

a. Effective assistance of counsel requires a reasonable standard of professional conduct; it does not require clairvoyance.  <u>State v. Mitchell</u>,

68

590 S.E.2d 709 (W. Va. 2003), <u>State v. Hutchinson</u>, 599 S.E,2d 736 (W. Va. 2004).

b.  The portion of the petition alleging ineffective assistance of counsel is largely based on the failure of trial counsel to move for a change of venue. It is not contested that their [sic; there] was no mention [sic; motion for change of venue?] made, however, there is no evidence that the failure to make the motion was in any way deficient under any standard of reasonableness, such as that set forth in <u>State v. Miller</u>, 459 S.E.2d 114 ([W. Va.] 1995).

c.  The Petitioner asserts that trial counsel Jane Moran and Geoffrey Ekanasi were ineffective in their representation because they did not file a motion for a change of venue, did not investigate and/or employ anyone to ascertain any effect of pre-trial publicity, and did not properly address questioning of witnesses. <u>State v. Williams</u>, 305 S.E.2d 251 (W. Va. 1983).

d.  In examining the issue of adverse publicity and hostile community sentiment, I would note that a review of the record of this case indicates that jurors were fully and adequately questioned about their knowledge of the case both through general and individual voir dire, that the jurors had little knowledge of the case, and that there was no evidence of any hostile attitude or hostile community sentiment that would have made it unfair to hold the trial in Logan, West Virginia. *Trial Transcript - Day 1 - Pages 8-9, 35, 37, 40, 49, 50-53, 67-68*. This is consistent with observations of the undersigned Judge that many people in this area do not read the local newspaper or listen to local radio, and that their news and entertainment often comes from cable or satelite [sic; satellite] television. I would note further that an occassional [sic; occasional] trial will be focused on by local media for in depth coverage, but that most, including murder cases, receive sporadic coverage.

(# 18, Ex. 5 at 5-6).

A defendant is guaranteed a trial by an impartial jury under the Sixth and Fourteenth Amendments.  *See*, e.g., Duncan v. Louisiana, 391 U.S. 145, 149 (1968); Sheppard v. Maxwell, 384 U.S. 333, 362 (1966)("Due Process requires that the accused receive a trial by an impartial jury free from outside influence.") Absent contrary indications, jurors are presumed to be impartial.  Poynter v. Ratcliff, 874 F.2d 219, 221 (4th Cir. 1987).  Juror exposure to news accounts of crime does not alone presumptively deprive the defendant of due process.  Murphy v. Florida, 421 U.S. 794 (1975). Pre-trial publicity can only be presumptively prejudicial when the publicity is so invasive that the setting of the trial becomes "inherently prejudicial."  *Id.* at 803; see Sheppard at 363.  The undersigned will be guided by this clearly established Federal precedent in ruling on Petitioner's claim.

Any motion for a change of venue would have been meritless and futile, and there is no indication that the trial court would have had substantive reason to grant it.  In order to prove prejudice, the Petitioner would have to prove that had the venue of his trial been moved, he would have been acquitted.  Based upon a review of the entire record, the undersigned is satisfied that the jury pool in the instant case was not tainted by "so huge a wave of public passion" that the impaneling of an impartial jury was not possible. See Sheppard, 384 U.S. at 351.  The transcript of the voir dire demonstrates that no jurors who remained on the jury panel were so

70

swayed by any pre-trial publicity as to be unable to impartially consider the evidence presented at trial. Moreover, Petitioner has not demonstrated that his jury was in any way biased or motivated by race. Thus, Petitioner cannot show prejudice from his counsels' failure to move for a change of venue, or failure to engage in additional study of the pre-trial publicity and additional voir dire on that topic.

Petitioner's fifth claim of ineffective assistance of counsel alleges that his counsel failed to challenge the composition of the grand jury or its procedure. Petitioner fails to provide any further argument or evidence concerning this claim. Thus, it is mere speculation based upon conclusory allegations. Petitioner has not affirmatively proven that the results of the proceedings would have been different but for the deficient performance of trial counsel. Consequently, this claim must fail, as well.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to rebut, by clear and convincing evidence, the presumption of correctness of the state court' decisions finding that Petitioner's counsel was not ineffective. The undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on these claims were neither contrary to, nor an unreasonable application of, clearly established Federal law, and that Respondent is entitled to judgment as a matter of law on

Ground Nine of Petitioner's section 2254 petition.

**K.   Ground Ten - Non-disclosure of grand jury minutes.**

In Ground Ten of his section 2254 petition, Petitioner contends that he was denied his right to a fair trial because of the non-disclosure of grand jury minutes. Petitioner addressed this claim in section "IV" of his amended circuit court habeas petition as follows:

> Your Petitioner, Brandon Blackmon, was denied the right to fair trial in this matter because of NON-DISCLOSURE OF GRAND JURY MINUTES. Your Petitioner filed the necessary requests for pre-trial discovery. However, the Grand Jury minutes were never provided to your Petitioner until after the trial. If the Grand Jury minutes had been provided as required, testimony of the lead investigator (Trooper C.J. White) could have been impeached as inconsistent.

(# 2-2 at 71, Appx. D at 14). Petitioner repeats this allegation, without further argument, in his habeas appeal petition. (# 2-2 at 36, Appx. B at 32). In his section 2254 petition, Petitioner adds "lead investigator Senior Trooper C.J. White's testimony before the grand jury was the complete opposite of what he testified to in front of the trial jury." (# 2-1 at 18).

Respondent's Memorandum of Law in support of his Motion for Summary Judgment addresses this claim as follows:

> Petitioner next complains that he was denied his right to a fair trial because of non-disclosure of grand jury minutes. The only argument Petitioner offers in support of this claim is the grand jury minutes could have been used to impeach the testimony of Trooper White. Petitioner goes no further.

72

There is no argument or showing in Petitioner's claim that Trooper White's testimony was anymore than inconsistent which is neither sufficient to impeach Trooper White's credibility nor to overcome the remaining testimony that corroborated his testimony. Even had Trooper White been impeached, there was sufficient remaining evidence to sustain the verdict. Therefore, any failure of the State to provide the defendant with the grand jury minutes was harmless at best. <u>Brecht</u>, <u>supra</u>. [FN 12]

[FN 12 - The issue of whether or not the grand jury minutes contained exculpatory evidence was not developed by Petitioner either in the instant federal petition or at the state court level. Therefore, Respondent did not answer on that point.]

This claim is insufficiently pled to state a claim in federal habeas corpus. Even were this ground well pled and true, without a showing that the grand jury minutes contained evidence material to guilt or innocence and not garden variety inconsistencies, there is no federal issue on which relief can be granted.

Petitioner has produced no authority that rebuts the findings of the habeas court.

(# 19 at 40).

Petitioner's Response to the Motion for Summary Judgment states:

The State's withholding Petitioner's Grand Jury minutes seriously sabotaged Petitioner's trial defense, Direct Appeal, and subsequent habeas' [sic; habeases?] Had Petitioner been provided with timely requested Grand Jury Minutes, he would have been able to prepare a proper defense, question, confront, and impeach damaging crucial and prejudicial and conflicting statements made by Lead Investigator, Senior Trooper C.J. White, who was the only witness called to give testimony which resulted in indictment.

During the Grand Jury hearing, the Prosecution/State had him read selected "self-serving" sections of nine (9) different individual statements of their choosing to justify their immediate needs, even though there were

other portions which contradicted what was read.  Amongst
these nine (9) individuals there were a total of twenty-
four (24) various statements.  There is no way either of
them could not have known that he was giving perjured
testimony because the statements he read in front of the
Grand Jury, he took and supplied copies to the State.
*See Exhibit(s) 10, 11.*

(# 23 at 30).

Petitioner's Response then details various witness statements
and evidence that he believes Trooper White manipulated in order to
produce evidence that was more likely to lead to an indictment.
Petitioner's Response winds up arguing that Trooper White unduly
influenced the Grand Jury to return a fraudulent indictment.  Such
a claim was not raised in any of Petitioner's prior proceedings,
was not raised in Petitioner's section 2254 petition, and is
unexhausted.  Accordingly, the undersigned will not address Ground
Ten of Petitioner's section 2254 petition in that light.  The
undersigned proposes that the presiding District Judge **FIND** that
this specific claim that a fraudulent indictment was obtained is
unexhausted, and is not reviewable by this federal court.

Turning back to Petitioner's claim that Petitioner was denied
a fair trial because of the non-disclosure of grand jury minutes,
Petitioner's sole argument is that he was unable to properly
impeach Trooper White's trial testimony.  Based upon a review of
the grand jury minutes and trial testimony, the State habeas court
found that there were no "obvious crucial inconsistencies." (# 18,
Ex. 5 at 7).  The State habeas court further stated:

74

> It has long been the practice in this circuit for judges to routinely order preparation and supplying of Grand Jury transcripts without any objection by the prosecuting attorney.  The prosecuting attorney generally does not purchase Grand Jury transcripts.  No attempts to prevent the Defendant from obtaining the Grand Jury minutes were made.

(Id.)

The undersigned has compared the Grand Jury Minutes to Trooper White's trial testimony and has found no material inconsistencies that could not have been developed on cross-examination of Trooper White using other evidence, including the police report and the statements of all of the witnesses, which the undersigned believes were provided to Petitioner in advance of trial.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that he was denied a fair trial based upon the non-disclosure of the Grand Jury Minutes.  The undersigned further proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that the state courts' decisions denying habeas corpus relief on this claim were either contrary to, or an unreasonable application of, clearly established federal law and, thus, Respondent is entitled to judgment as a matter of law on Ground Ten of Petitioner's section 2254 petition.

## **RECOMMENDATION**

For the reasons stated herein, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot succeed on any of the claims contained in his Federal habeas corpus petition

and, thus, Respondent is entitled to judgment as a matter of law on each of Petitioner's claims.  It is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 18), **DENY** Petitioner's Motion for Denial of Summary Judgment (# 23), and dismiss Petitioner's section 2254 petition with prejudice.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th

Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on the opposing party and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and to transmit a copy to counsel of record.

<table>
<tr><td>   August 2, 2010   </td><td><em>Mary E. Stanley</em></td></tr>
<tr><td align="center">Date</td><td>Mary E. Stanley<br>United States Magistrate Judge</td></tr>
</table>